Could you just remind me how have you all decided to divide the time? That was actually the first thing I was going to say. I have with me to my left Susan Oxford of the EEOC. I had previously, and it's my intention to give five minutes to her, of my 15 minutes. Okay. Good morning, Your Honors, and may it please the Court. The material facts of Kristen Biel's employment relationship with St. James School remain undisputed. And yet at the district court below, the district court erred by ignoring many of these facts in its finding that Kristen Biel was a minister for purposes of the ministerial exception. And respondents position that the functional consensus test remains relevant after the Hosanna-Tabor decision is even more problematic still. For one, Kristen Biel does not share a similar education and background as Cheryl Parrish in the Hosanna-Tabor decision. Kristen Biel received her degree in liberal studies with a teaching credential from California State University, Dominguez Hills, after transferring from Cal State Fresno and El Camino College. Counsel, can I just interject and cut to the chase in terms of my thinking on this? Of course. I think you certainly make a good argument that this case is not as strong a case as Hosanna-Tabor for applying the ministerial exception. Each of the four, whatever we're going to call them, factors that the Court articulates there don't quite line up here. But it seems to me the trend in the post-Hosanna-Tabor circuit court and also the district court decision, so put aside all the pre-Supreme Court case law, the trend seems pretty clearly to favor applying the ministerial exception whenever a teacher at a religious school has some role in conveying the tenets of the faith. And it seems to me if we ended up following that trend, your client would lose here because she did have some role, right? I think it was 30 minutes per day, and in addition, even for the secular subject, she was involved in trying to incorporate the religious message into the lesson, right? So if that, if we were to deem that alone sufficient, I mean I think you'd have to concede that you would lose, or that's what I just want to tease out for you. Well, in response, I've got a couple distinctions to your comment. One, just to be clear for the record, we don't, we're not putting forth that these four items considered by the Supreme Court and Hosanna-Tabor are factors. We do not, we put them up as general considerations, questions that the court may ask to guide its analysis into the particular religion. Wouldn't it help you to consider them factors? Because they're not satisfied. Well, no, I don't want to consider them factors because I believe Chief Justice Roberts in his majority opinion, he really warned against, and I think you see it in the concurring opinions, warned against putting it up to a bright-line factor test. And I think that's where Justice Alito's concurrence kind of plays into that. I think overall, analyzing it through the lens, you have to analyze each case on its merits, you have to analyze each case under a totality of the circumstances test, asking questions that are relevant to the particular religion. And I think Justice Alito wanted to highlight the importance of doing so because he highlights in his concurrence that not all religions will consider the phrase minister. They may be structured differently, they may have some different hierarchical structure to them. But I think that's why you have to look at each case on its merits, the totality of the circumstances, ask these questions if relevant, and then beyond that you can ask a few more. And just furthering that real quick. Well, let me just, I don't know. I know I didn't ask a very good question, but I'll tell you what troubles me. For a teacher who is involved in conveying the tenets of the faith, right, if that's a part of their duties, I just see a real danger if that's not alone sufficient to qualify them for the ministerial exception. And we're going to have cases where somebody is terminated, as in this case, and the response from the school is going to be, it's going to have something to do with the nature of their instruction, right? And we then will be, what, forced to, we can't be involved in judging whether the teacher was sufficiently, adhered sufficiently closely to the teachings of that religion, right? So that's why it just seems like we need a buffer to keep us, to keep us as federal courts out of that. And that's why I'm just not, I think I understand why the trend in the case law is going against you, and I'm just trying to get some sense from you how to, what basis do we have for resisting that trend, at least as I see it. Well, we would agree it's a trend, and for that I'd like to compare it to the Gruscott decision out of the Second Circuit, I believe. Seventh. Seventh, I apologize. In the Gruscott decision, the particular teacher here was a Hebrew and Jewish studies teacher. That was her title. She was brought on by the school for that particular role. She evidenced a background and resume that really showed she wanted to come on to the school, and she had been teaching religious and religious studies for quite some time. And it kind of brings back to what my second point to your first question there is, really this is a case about context. And I think when you look at the facts, you know, while certainly she did perform some religious function per day, again, Chief Justice Roberts said you can't put, you can't consider that in isolation. I think it talked about that when he was analyzing the Sixth Circuit's decision below, how they put a focus into the non, the secular functions of the particular teacher, Cheryl Parrish, in that particular role, said you can't put a stopwatch on it and you can't consider it in isolation. So I think if you need to look at it from the totality viewpoint, but then also in context this Gruscott decision by, again, comparing this teacher to, if you want to compare it to Cheryl Parrish, if you want to compare it to this case of Barr, she was, like I said, a Hebrew and Jewish studies teacher. Our teacher came on. Her formal title was she was a fifth grade teacher. It carried with it no religious connotation, no religious meaning for it. Her background here by comparison to even Gruscott in that post-Hosanna world shows that her resume and experience is not one of religious teaching. It shows that she was really brought on in an effort to, I believe my client really just was brought on to, she just was looking for any job she could get post-graduation. That's all fine, but the job she got was the one she signed an employment agreement for. And I'm looking at Exhibit 1 in the deposition that was taken, and the first term is the term itself. The second is the philosophy. It sets right out there. It says, It's understood that the mission of the school is to develop and promote a Catholic school faith community within the philosophy of Catholic education as implemented at the school and that the doctrines, laws, and norms of the Catholic Church, all duties and responsibilities as a teacher, shall be performed within this overriding commitment. I mean, when you talk about whether the factors are mandatory or factors that should be looked at, which Justice Alito referred to, you look at the totality of the circumstances, this hits you right in the face. And this philosophy term seems to me to override everything else that your client may have been required to do. Judge Fischer, in responding, two responses. And my first response, I'd like to go back to the McClure decision, the Fifth Circuit 1972 decision, when the ministerial exception first came up. And I think that's been guiding the circuit courts both before and after this Hosanna decision. And in that case, they do talk about, when they frame the issue of what a minister is to a church, they use the phrase lifeblood. And I think, secondly, the next line out of that decision says the minister is, quote, the chief instrument by which a church seeks to fulfill its purpose. So I think while certainly if you look on the face of her contract, she had some contribution to the church. The question then remains, is she having a chief contribution? Is she leading services? Is she holding herself? And I guess that's where it comes back to the Hosanna, one of the Hosanna factors or questions, however this court would like to consider it, is how is she holding herself out to the community? If you turn to the record, you find that any prayer in her classroom, she wasn't the one leading the prayer. There were student leaders leading the prayer. And these were student leaders that already knew the Catholic faith is so well in doctrine that these student leaders knew the prayer was going into fifth grade  And you look at her role in Mass, and that's at the record at 227 through 229. At Mass, the primary role, she says in her deposition, was to keep students quiet and in their seats. It wasn't to get up there and lead the sacrament. It wasn't up there to get up there and lead some kind of worship service, as you see in, as is the pen decision with a chaplain in a hospital. Isn't that one of the very purposes of the ministerial exception? To keep courts, particularly federal courts, from going in and examining task by task the degree to which the various employees may be playing a role and what particular role they're playing in the development of the church mission. I mean, it seems to me that's part of the exception. That's a big part of the exception. It is, but again, I would come back to, I think, two answers real quick and then I'd like to reserve the remainder to give to the EEOC. One is that the Supreme Court, I think, has opened up the door for the inquiry into the particular circumstances and relationship of the employment from the employee to the employer. I think you're allowed to ask that question. The concern of the Supreme Court really was divulging into a pretext analysis, looking beyond that, looking as to the reason why they got rid of her. Going beyond that, I don't think the court should be asking that question. The Supreme Court has opened up the door. I think number two—actually, I apologize. I lost my train of thought there. But I would like to just reserve just a brief remainder for the EEOC unless you have any further questions. Why don't we hear from the EEOC? We'll give you a little bit of time. Thank you. All right. Good morning, and may it please the Court. My name is Susan Oxford, representing the EEOC as amicus curiae. To start with, Judge Wadford, your initial premise, EEOC respectfully takes issue that the trend appears to be to apply the exception to facts like this. In fact, there's no case that has applied it, no court of appeals case that applied it in facts that are close to this. And the Seventh Circuit's decision in Gruskut is a good illustration of how different the facts were there when the ministerial exception was applied. There, the Seventh Circuit said that it was not going to apply or it would not apply the ministerial exception to something that had just one of the four categories of factors that the Hosanna-Tabor Court considered significant. And in response to your question, they are factors to be considered. It's not a rigid test. That's, I think, what might be. Well, I'm interested in, are you agreeing with the Seventh Circuit? Because I thought you might come in and say the Seventh Circuit decided that case incorrectly. No, we are not disagreeing with the Seventh Circuit. What the Court said there is, although the title that Ms. Gruskut carried of teacher was not itself a religious title, it carried significance. So she was a Hebrew teacher, and she was hired to give integrated instruction using the TAL-AM curriculum that integrated Hebrew language instruction with Jewish religious studies. She was hired because she had experience to do that. It requires a special certification, which she already had. And it was her job all day, every day. It was her full-time job to give Hebrew instruction integrated with Jewish religious studies. That distinguishes her very markedly. I don't think so at all, actually. I think that's just like here, because it wasn't as though the only religious component of Ms. Beal's instruction consisted of the 30 minutes per day on religion explicitly. Part of her duties, as Judge Fischer mentioned, by contract, was to instill all of her lessons, even for the secular subjects, with the religious tenets of Catholicism. And so my concern is that as soon as somebody has those kinds of duties, put aside this case, we're going to have cases where somebody says, hey, I was fired because of this or that, and it's protected by federal law. And the response is going to be, no, we fired you because we were unhappy with the nature of your religious instruction. Let me respond to that, too. There's a second doctrine not at issue here, but which is at issue in the Peary decision, currently on appeal again for the second time to this court, and that is the ecclesiastical extension. So where a court is relying on a religious reason for taking action against one of its employees, then the courts will look carefully at determining whether that religious reason is a pretext or is the sincere reason would involve the courts too much in a religious decision. All of the cases that we're looking at here where the ministerial exception was in dispute are cases where that was not the reason alleged by the employer. And St. James here, the reason they didn't want to continue Ms. Beale's employment, two reasons, she says. Her students had cluttered desks and her classroom seemed chaotic, and it would be unfair to the students to have two teachers in the same school year. They did not say that she wasn't teaching Catholic religion properly or infusing. In fact, she got a positive evaluation on whether she was infusing Catholic values into the classroom. So allowing Ms. Beale to pursue her ADA claim of failure to accommodate and discharge does not entangle the court in determining whether the school had a religious reason for firing her that wasn't sincere. See, I don't think, I think you're right in this case. That's why I said put aside the facts of this case. But as I understand the way the ministerial exception works, it's pretty much a categorical, it's sort of, you know, it's kind of a bubble. And once you're in that bubble, the courts are not going to intrude. And so I don't think our analysis of whether the ministerial exception applies can turn on the specific reason in an individual case that the defendant's school gave for firing the person, can it? Correct. So that's why it's so important that this court decide this case carefully and on the correct principles and not overly broadly, because a person would lose their rights entirely to pursue federal civil rights that other employees have. Okay. And in fact, if she has an ADA claim and actually the employer fired her for not being a good Catholic teacher, she'd lose, right? She would lose, exactly. And if that involved the court in too much delving into the Catholic tradition, that would be the ecclesiastical abstention at play. Exactly. The question is, is she a minister when her only duties are these religious tasks, which are far less than Cheryl Parrish was performing for Hosanna Tabor? And if the Supreme Court thought that that was enough, then Justice Roberts wasted a lot of words and a lot of analysis in covering all of those other factors. No, I don't think that's fair. I mean, they're given the case that they're given. It's a much more compelling case, I grant you, than this one, but you rely on all of the tools that you have to work with in setting forth the exception. But the court did say that it is not deciding whether that alone would be enough. That's what we have to decide. And I think for good reason. And no circuit court since then has looked at a single factor and held that that was enough. The Seventh Circuit found two factors. The Sixth Circuit found two factors. The Fifth Circuit said expressly in Cannata that we are looking at the entire circumstances and determined that the music director was an integral part of the sacrament of the Mass and that everything that he did in terms of leading the choir, training the cantors, providing the music, selecting the hymns, all went to sustain the religious element of that sacrament of the Mass. What are you saying, that there has to be at least a certain number of factors? I'm saying that at least what we know is the other circuit courts have declined to apply it when there was only one factor and have found at least two factors, and those factors have all shown much further extensive involvement in religious. But wouldn't there be at least two factors here? No. There was a single factor here, and that is the performance of her religious functions. What about the substance behind the title? She was a teacher. And the substance behind the title shows that all of her training and experience was as a teacher, and she had no religious doctrinal training. I don't know how you can say that in light of an employment agreement. The employment agreement requires her to do, as I assume the janitor had to do and the secretary had to do and the PE teacher had to do, and that is to reflect Catholic values in the way you conduct yourself and the way you treat students and teachers. I think it goes beyond that, though. It's not just being a role model, because I grant you, every employee of the school would have to do that. It's the substance that she's infusing into the lessons. On that, I think it's quite significant that the record is clear. The teachers did not have to be Catholic to work at St. James, and the religious tasks that the school points to, every single one of them, the school says it required of all its teachers. There's no exceptions. They do not say they required it only of the Catholic teachers, and it's quite feasible that that could be done here. If you look at what they were doing, praying with the students, as Ms. Beal said, the students led those prayers and they were the recited prayers of the Catholic church. They weren't extemporaneous prayers that a religious leader was designing. The religious instruction she provided 30 minutes a day was from a workbook. The instruction came from the workbook. The quiz came from the workbook. She accompanied her students to chapel where she kept order, and I want to point out there's a couple critical errors in St. James' brief. The facts are clear that occasionally Beal's students presented the Eucharistic gifts, but St. James, in its brief at page 26, mistakenly says that Beal occasionally gave the gifts, and that's not reflected by their own statement of facts if you look at that. St. James says that she attended the religious education conference yearly, but the record is clear it was every other year and it was four to five hours, so basically two and a half hours of religious instruction a year on how to integrate Catholic values into the classroom. But beyond that, her religious tasks were something that the school required, even of non-Catholic teachers, and did not require any exercise of spiritual leadership on her part. So I see that I'm well beyond my time. I mean, if you have more to say, this is a difficult case. We're happy to hear you out. It's a very difficult case. It's very nuanced, and we appreciate the attention the Court is paying because this will be the first case that would find, if this Court affirms, this will be the first time that a court of appeals applies the ministerial exception to an individual who has such a role that is not one of leadership within the Church. Or pretty much full-time ministry. I don't think that's right. For the court of appeals. I'm sorry. I didn't mean to interrupt you. No, go ahead. It's true for the court of appeals. There are some district court decisions, some that did not go up in appeals, some that are still pending. I was trying to focus on circuit court decisions, but I read these cases a little while ago, so remind me, you're saying that none of the circuit court decisions, I thought we had several circuit court decisions involving teachers who didn't do a whole lot more than Ms. Beal does in terms of conveying their religion's faith. They didn't have the formal title of minister or anything comparable, and yet the ministerial exception was held to apply. So just remind me, what are the distinctions? Five circuits have addressed the question since Hosanna Tabor. The fifth circuit was the first one in Kanada versus Catholic Diocese of Austin, and in that case, a music director was found to fall within the ministerial exception where he selected the hymns that were going to be sung. If he was away on vacation, he selected them before he left. He said that he taught the cantors how to sing the songs during the mass. He led the choir and led the choir practices, and then he played the music during the services, and the church said the music is an important integral part of the sacrament of the mass. And I think another thing that's very important about that case, if I could just add, the defendant in that case argued that everyone who participates in the music of the mass is part of this ministry, is performing ministry. So that would be the choir members, the cantors, and the fifth circuit did not find that the plaintiff fell within the exception because everyone who performs music did, because he had the leadership role. But correct me on this, because it's not – I didn't think the ministerial exception was limited to those who are leaders of the faith in the sense of shaping the direction that the faith is going to go into. The concern is that we don't want to get into – it's anyone who conveys the message of the faith. That's what we want to keep out of, right? And it seems to me that that's why I would say that any teacher who has a religious component to the instruction she's giving to her students, we're already into that territory. And it doesn't matter if they're not a leader in the sense of, you know, selecting the nature of the hymns that were being sung, right? If this court were to go that far, number one, it's a risk of swallowing the rule. Well, this is partly why I thought you might say the Seventh Circuit was wrong. Because if you put aside the Seventh Circuit, I mean, aren't most of the cases about leaders? So, I mean – Yes, and I think the reason that we don't stand here saying the Seventh Circuit got it wrong is because the Hebrew instruction and Jewish religious studies were integrated completely, and that was her full-time job. So she was not the – You need to have the training. You need to have the training or else you have a problem. Right, and so in terms of looking at the Hosanna-Tabor factors and saying there was some point to Justice Roberts' opinion that you look at the entire context, the totality of circumstances, the Seventh Circuit said that there's substance behind her title of Hebrew teacher. She wasn't a teacher who incidentally taught her students a half-hour of Hebrew instruction every day and then taught them science and math and social studies the rest of the day. That was her full-time job all day, every day, and it was infused all day long with the religion. So I was going to ask them this question, but maybe it is a good question for the EEOC. In Hosanna-Tabor, one of the factors was that she had this title that seemed like a minister, right? She's a called teacher. Yes. And she put on her tax returns that she's a minister, and so she took a tax deduction. It seems like that is sort of a trade for either federal employment law applies or it doesn't, and if you're going to be a minister, then you don't get the protection of federal employment law, but if you're not a minister, you do get it, and it seems like maybe one of the key things here is whether people know whether they're going into a job that's protected or not. Is that something that's important to the EEOC? I think that's incredibly important because if this court were to affirm, then there are thousands of Catholic teachers who would have lost their rights that they would rightly assume before now they would have as compared to their other teachers and other individuals in different professions. And so I think when the Supreme Court said you look at the title given and the substance behind the title, in part they were looking at not what was Hosanna-Tabor arguing after the lawsuit filed. They were looking at what did they say beforehand because to the extent Hosanna-Tabor called her a minister and had this special church service where they commissioned her to be a minister, that gave some substance to the fact that she was more than just a teacher like the other non-called teachers, that she had some extra status. And I think that that's the element of spiritual leadership, and if you look at what Cheryl Parrish did in Hosanna-Tabor, it is far more extensive than what the teachers at St. James are doing, which St. James has all of its teachers, Catholic and non-Catholic, it requires them to do. There were no non-Catholic teachers if I recall. So I grant you that it wasn't a requirement per se, but I think the head of the school said there were no non-Catholic teachers. At that time there were none, and it wasn't a requirement in their statement of facts. There had been in the past. I thought there were non-Catholic teachers. What the record indicates is being Catholic was not a requirement for the job, and then the record also, if you look at the St. James Statement of Undisputed Facts, I have the pages in the excerpts of record, sorry, I don't have the page, excerpts of record 35 to 42, there are numerous points where they point out what they were asking Ms. Beale to do that they allege is religious, and the fact that this is what they're requiring all their teachers to do. So is there just nothing in the record about whether they ever had a non-Catholic teacher? Correct. There's nothing I could find in the record on that. I thought the head of the school was asked in conjunction with noting that it's not a requirement, but then said, but the reality is that all of the teachers are Catholic. At that point, at the moment when she was asked about it, they ran through the grades and she said, yes, those individuals have to be Catholic. Okay. Do you have a concluding point? Because we've let you go way past your time. We would just ask this court to take seriously what the Supreme Court said about considering all of the factors, and look again, I didn't get through all of the circuit courts, but if you look again carefully at the four circuits beside this court that has already applied the Hosanna-Tabor case, you'll see that in every case they were looking at the totality of circumstances, there's no circuit court that has applied it to the narrow religious tasks that are done here. I say your time is up, and then I ask you another question, but your position is that the person really does have to have some kind of a leadership role? It's not enough that they're just conveying the message of the faith? I think there's two ways. Perhaps Ms. Gruskud in the Seventh Circuit case didn't have a leadership role, but she was performing this religious instruction all day long. So I think there's two ways. And she had the special training that was required. Yes, which was required and a certification, and she was hired because of her experience. So I think if you're doing it full time, that might be one factor, and otherwise if you have a leadership role, and I also didn't get to, but Cheryl Parrish, she gave devotions to her students that are beyond any kind of script that the school was providing to her, and at least twice a year she was designing and leading the worship service, including delivering a sermon. I think the factors there are just far more. Okay. Thank you for participating. We really appreciate the EEOC's willingness to come and help us out. Let's hear from counsel for the school. Good morning, Your Honors. May it please the Court. My name is Jack Sholkoff, and I will be speaking on behalf of the Appali St. James School. Kristen Beal was hired to teach fifth graders a variety of things, including how to become committed, caring Catholics. It was a Catholic school. It was part of the St. James Parish. One of the parish ministries is a school, and this is not unusual. Many parishes have that. And as part of her employment, she was employed and signed an employment contract, which was signed by her principal, Sister Mary Margaret, and by Monsignor Myers, the pastor of the church. Ms. Beal understood that the mission of the school was to develop and promote a Catholic school faith community within the philosophy of Catholic education. Can I ask you this? I mean, it seems to me your position has to be this, that even if the teacher is not a member of the faith and has no discretion whatsoever in terms of selecting what's going to be taught, they're just teaching from a workbook, that if any component of that instruction that they're giving to their students is tied up with the religious faith, then they are going to be covered by the ministerial exception full stop? That's your position? That's correct, Your Honor. The purpose behind the ministerial exception is to avoid the government from entangling itself in the selection of those who convey and teach the faith. Basically, every religious school teacher will be under the ministerial exception then, right, if we agree with you? Well, it depends how you define religious school teacher. What I can tell you that in this case, the facts clearly demonstrate that Ms. Beal was teaching fifth graders elements of the Catholic religion. When you look at her lesson plans ñ Any teacher who's at any religious school who spends five minutes a week probably doing religion is going to have to be covered because otherwise we have to draw lines about 20 minutes or 15 minutes or 10 minutes. Once they're teaching religion at all, which probably most religious school teachers do at least at holiday time, it counts? Well, the Supreme Court stated that you can't use a stopwatch. Chief Justice Roberts specifically states that in Hosanna. So the courts aren't going to be engaged in a five-minute, 10-minute, 20-minute. What they are going to look at is what exactly is the instruction and the purpose of the instruction. And so in this case, again, when you look at the lesson plans, you look at the evaluations, that it is about teaching fifth graders how to become Catholics. And most Catholic school teachers across the circuit would also have that situation, right? I can't speak for all Catholic schools, but I can certainly say that Catholic schools in general have the purpose of conveying the faith to students. That's maybe one of the reasons, obviously not in the record, one of the reasons why parents send their kids to parish schools. Certainly if the school's purpose and the teacher's purpose is to teach Catholic subjects, that person is going to be covered. So if you're someone who is in this situation, she doesn't have like a religious degree, she even could have been Presbyterian maybe or something, she gets this job. Does she have any reason to believe that she's not covered by the Family and Medical Leave Act, the ADA, all the regular employment laws? Well, I'm not sure whether her understanding of what laws she might be covered by is necessarily germane to the issue of the ministerial exception. Well, maybe it is, because if you can be fired for basically, I mean, if the ministerial exception applies, then the church can fire her for any reason, no reason, whatever, no one's ever going to be able to ask, right? So that's a much less protected job. Maybe you ask for a higher salary, maybe you negotiate differently, maybe you look for a different job. If people don't know they're entering that bargain, how is it fair? Well, the First Amendment and the Supreme Court has established the value judgment that the protection of religious freedom in this case, and for the church or the synagogue or the mosque or whatever religious organization that it wants to stay out of, who determines or who teaches that and conveys that faith. So the First Amendment is the value here. And the Supreme Court in Hosanna Tabor talks about this. They talk about the history of the head of the church, the head of the Church of England. I mean, we're not talking about the 20,000 employees that the Catholic Church employs. I don't know how many thousands, you know, in California. If you go back to the core of what this is about, I think the history is it's about the very leaders, right? Well, certainly that's discussed in Hosanna, but Ms. Persich in Hosanna Tabor was not a leader of the church. But the church had a whole ceremony where they called her one of their ministers, and then she called herself a minister on her IRS form. That's correct, but that was not dispositive. How do we know it's not dispositive because they say they're not deciding anything else? Well, if you look certainly at the other circuit court's decisions, none of those people were heads of their organizations. Ms. Grusgott at her Jewish day school was not principal of the school. And, in fact, in the Fratello case, the principal of that school was a lay principal of a Catholic school and was not certainly a vowed member of the church or a priest or a nun. But in the principal case, the court said that the principal was really guiding the whole faith of the whole school and setting the whole religious curriculum, and I thought there was a lot of leadership in that discussion. There was some leadership in that case, but I think that, you know, of the appellate court cases, that if you look at the Conlon case, which is out of the Fifth Circuit, that was a college spiritual director who had no training, wasn't ordained. And her only job was, quote, leading others towards Christian maturity. Now, as a fifth-grade teacher, Ms. Beal was leading and instructing those fifth-graders. And as a fifth-grade teacher, it is inherent that she is or could be a mentor for them. I mean, we all have fifth-grade teachers, if we're lucky enough to remember them, that may have had an influence on us. And so to suggest that a fifth-grade teacher teaching religion to 11th- and 12th-graders is not providing leadership to them and teaching to them and conveying the faith to them, I think misunderstands the role of a teacher. And, in fact, the idea of a teacher- So you could say that, yes, they're teaching the faith, but that doesn't necessarily mean that this exception from all federal employment laws should apply to all people who have any role at all in conveying the faith. I'm not sure that that's what the Supreme Court said or what the history of the reason for the exception says. I mean, maybe it's what the Fifth Circuit has said, but we don't have to agree with the Fifth Circuit. No, I understand that. I think that the Supreme Court certainly says in Hosanna that, quote, the church must be free to choose those who will guide it on its way, unquote. That's at page 710. And that it talks about the person who's the messenger or teacher of the faith being so important to the church because the church can only survive. How is this Miss Beal, who's been there for a year, only teaching fifth grade, guiding the whole church? I mean, she wasn't. Well, she's guiding those fifth-graders who to become- her job as a fifth-grade teacher is to guide those fifth-graders to become committed, caring Catholics. Is she determining all of Catholic doctrine? No. But is she teaching things about the Eucharist, about the liturgical year? One of her lesson plans specifically says that she is teaching, quote, the students, quote, to know and understand the meaning behind becoming a Catholic. That's at SER 53 and, again, at SER 109, 1115. And someone who wasn't Catholic could have given that lesson, too, right? That's undisputed here? Yes. That is that Sister Mary Margaret testified that she preferred having Catholics. But I think we have to be very careful about suggesting to the church who should be conveying that message, whether they need to be Catholic or otherwise, because now we're making a value judgment about the religion of that teacher. And I think that if the church believes that a non-Catholic or the school believes a non-Catholic can effectively convey the faith, I don't think it's the government's position pursuant to the First Amendment to say, well, no, you really need a Catholic there. And I think that so the reality is, was a Catholic required? No, but the school had made a value judgment. Go ahead. Mr. Shulkoff, I just wanted to ask you about one of the factors here. How should we analyze the second factor, the substance reflected in the title? Well, I think that we do know that certainly in the Hosanna case that there was a whole ceremony that she went to, which does not exist here. We do know that Ms. Beale received some additional training attending the L.A. Religious Education Congress. We do know that Ms. Beale also received curriculum materials and lesson plan guidance, all of which made her the ‑‑ I think that when we're looking at the substance behind the title, that a fifth grade teacher in of itself who is teaching religion, by the fact that she is standing up in front of the classroom and is acting as a person who is teaching that faith, inherently has substance behind the title of teacher. And I would also add that teacher in the Catholic faith is of a particular meaning, in that many Catholics or Catholics believe that Jesus was a teacher and was called teacher. So I don't think that we can necessarily minimize the idea of teacher. And in fact, in another day, another time, most parish teachers were nuns. That isn't the case anymore because there may be a shortage of nuns, but the job is to be, to model that role, not only model that role, but to teach that role and to be the embodiment in the classroom. But if someone's a nun, they know they can't sue and say they get to be the priest, right? Everyone knows that you can't ‑‑ you aren't protected by all employment laws if you have a certain kind of category in the church and your claim is a certain kind of leadership issue. But this is like regular employment law that most people think. They get family leave. They can't be fired for having a disability. Or at least could be accommodated. I mean, maybe there's no reasonable accommodation here. That's a whole other thing. Maybe she wasn't fired for this reason. That's a whole other thing. But you'd be able to fire everyone with diabetes, just blanket. No, we don't let anyone have diabetes here. I mean, you could do anything if we give you this exception for every teacher. And I don't understand how, like, the idea that nuns aren't protected gets you to every teacher who's not a nun. Well, I think that whether people know about the protections of the employment laws is not necessarily the issue. I think that all of the plaintiffs that have brought these cases in these other circuits believed, presumably, that they were subject to the protection of employment laws and then learned about the ministerial exception. I think that ‑‑ and it's also important to remember that this court is held in Elvig, that a claim for illegal harassment, for example, would not be covered by this. That if there's a termination decision, that obviously is covered. So I'm not sure what the difference is. So if the school here had said, we don't give anyone any medical leave, this teacher would have been essentially discharged, right, because she had to take this medical leave. So they wouldn't have had to fire her. They could just constructively discharge her by creating a rule that makes her have to quit. It's the same thing as harassing someone. If you harass someone and have an environment that's unsustainable so they quit, you haven't fired them, but they had to quit. And I don't understand what the difference is. It seems to me if you win this case, you can harass your teachers all you want to. No, I think that this court held in Elvig that in that situation, in your hypothetical that you've suggested, that the alleged victim of harassment would have a claim, potential claim for illegal harassment. They could recover emotional distress damages if they suffered them. What they could not do is sue for discrimination. They could not sue for wrongful termination. But they could sue for any kind of illegal harassment, hostile working environment harassment. So, yeah, it's before hosanna taber, though. And if we agree with you that all these teachers are in this category where they are not covered by the employment laws, then I don't really understand how that case survives. Because constructive discharge is constructive discharge. You can create an environment, whether it's you don't give someone medical leave, you don't accommodate them, or you harass them. All of them are ways of just creating an environment where you've got to quit. Well, I think that with regard to constructive discharge, that obviously that is going to be covered by the ministerial exception. But I think that there are separate claims for illegal harassment that would not necessarily raise constructive discharge. So I don't think that it leaves all teachers without any sort of remedy whatsoever. What it does do is it renders Title VII and the ADA unconstitutional because it runs afoul of the First Amendment. And really – Are you saying that all teachers at St. James are covered? Well, what I can say is that Ms. Beal is covered, but the record doesn't reflect what all of the other teachers are doing. If, for example – What if somebody came in, to give you an example, what if somebody came in strictly to teach phys ed and to be the grade school football and basketball coach and signed an employment agreement, which was identical to the one that Ms. Beal signed? I think it would be a much harder argument to make that they are covered by the ministerial exception because they are – if they're teaching phys ed and they may, in fact, be modeling being a good Catholic, they're not conveying the faith. And that really is, at the end of the day, what is going on. There's a case from Oregon. I know it's a district court case, but that was an exercise science professor. And that's Richardson v. Northwest Christian University. And he was supposed to model Christian behavior and infuse Christian values into PE, essentially. But there was no religious instruction, and that is what makes this case clearly fall under the ministerial exception because she wasn't just teaching Spanish. She was teaching a variety of things and spending every day teaching religion as well as infusing Christian values into secular subjects. So the issue of the PE teacher is obviously not before us, but I think that that is a harder case. But it's not this one. And I see that my time's up, so thank you very much. Thank you for your argument. With that, let's give counsel for plaintiff two minutes for rebuttal. Thank you. Just very briefly in response, I want to come back to the conversation regarding leadership and leadership roles. I think there is a clear distinction between, if you look at the Conlon case, they responded downplayed that role that the gentleman in the Conlon case had, but his title was spiritual director. And when the court in that particular case looked at that particular title, they found on its face and they held, quote, this is one of the clearly religious leadership titles, clearly religious leadership titles, spiritual director. And then on the fourth factor of what that religion, so again, two factors present there. On the fourth factor, they found that the role that he conveyed was, in fact, to convey the message of the church. The Fratello case, the principal in that particular matter, as stated by the EEOC, and we just want to reiterate, they picked and guided the school overall in the curriculum. They picked and they prayed over the loudspeaker every day. They had actions in there that conveyed a sense of leadership, not just to, let's say, the 22 kids in a classroom, but to the community, how they held themselves out to the church, how they held themselves out to the school was that of a leader, a church leader guiding the principle of the religion. In Penn, you had a hospital chaplain. That was a much, much more difficult and much different case. However, the title was hospital chaplain. What that hospital chaplain did was consult people at their most time of vulnerability, but he went throughout the entire hospital and did so. In Cantata, the music director, quote, unquote, and I know the EEOC touched on it, but we do want to reiterate that that music director oversaw the music department's budget and expenditures, managed the sound systems at the church, maintained the sound equipment, music room, music area in the sanctuary, rehearsed with members of the choir and cantors, accompanied them on the piano during services while running the sound board. There's a much larger encompassment of what these individuals are doing in their particular role in advancing the religious doctrine. And then just very quickly at the concluding point, you're over your time. Oh, I do apologize. Just turning to the one point that they do mention teacher, and he does say that, well, in the Catholic religion, Jesus Christ was a teacher. We do note in our footnote two in our reply brief regarding, if you look at the plain language definition of teacher, at most it encompasses a Mormon faith aspect to a plain meaning of the phrase teacher. Thank you, counsel. The case to start will be submitted and we will adjourn for the day. All rise. This court for this session stands adjourned.
judges: Fisher, Watford, Friedland